**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ROYAL OAK ENTERPRISES, LLC,     :
                                   :
             **Plaintiff,**     :
                                   :
      **v.**                  :     **Civil Action No. 13-1040 (GK)**
                                   :
PENSION BENEFIT GUARANTY     :
CORPORATION,                    :
                                   :
            **Defendant.**    :
                                   :

---

## MEMORANDUM OPINION

Royal Oak, LLC ("Royal Oak," "Plaintiff" or "the Company") brings this action to challenge an Order by the Pension Benefit Guaranty Corporation ("PBGC," "Defendant," or "the Agency").[1] On October 31, 2008, Royal Oak terminated the pension plan ("the Plan") it had previously operated for the benefit of its employees under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. After the Plan's termination date, Royal Oak changed the method it used to calculate certain payments to Plan participants. As a result of the change, the participants received approximately $2.1 million less than they would have been paid under the terms of the Plan as written on October 31, 2008.

---

[1] The PBGC is an agency as defined by the Administrative Procedure Act. See 5 U.S.C. § 551(1); 29 U.S.C. § 1302.

1

The PBGC, which administers Title IV of ERISA, 29 U.S.C. §§ 1301-1461, performed an audit of Royal Oak's pension plan termination. The Agency determined that Royal Oak had improperly decreased the value of plan benefits after the Plan's termination and Ordered Royal Oak to make additional payments to Plan participants.

On July 9, 2013, Royal Oak filed its Complaint seeking judicial review of the PBGC's Order. [Dkt. No. 1]. On September 16, 2013, the PBGC filed its Answer and a Counterclaim seeking enforcement of its Order. [Dkt. No. 11]. On January 22, 2014, both parties submitted their respective Motions for Summary Judgment, [Dkt. Nos. 19, 20], and thereafter, their Oppositions, [Dkt. Nos. 21, 22], and Replies, [Dkt Nos. 23, 24]. On April 8, 2014. With the Court's permission, the PBGC filed a Surreply. [Dkt. No. 30]. For the reasons set forth below, Royal Oak's Motion for Summary Judgment shall be **denied**, and the PBGC's Motion for Summary Judgment shall be **granted**.

## I. BACKGROUND

### A. Statutory Framework

#### 1. Overview of ERISA

Congress enacted ERISA to provide minimum standards that would assure the equitable character and financial soundness of employee pension plans. See 29 U.S.C. § 1001(c); Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720 (1984). ERISA

aims "to increase the likelihood that participants and beneficiaries under single-employer defined benefit pension plans will receive their full benefits." 29 U.S.C. § 1001b(c)(3).

ERISA's four Titles serve distinct functions within the statutory regime. Title I establishes the reporting and disclosure, participation and vesting, funding, and fiduciary obligations provisions pertaining to ongoing pension plans. See 29 U.S.C. §§ 1001-1191c.

Title II, codified within the Internal Revenue Code ("I.R.C."), relates to the qualification of pension plans for favorable tax treatment. See I.R.C. §§ 401-424.

Title III provides for coordination of jurisdictional, administrative, and enforcement issues among the PBGC, the Internal Revenue Service ("IRS"), and the Department of Labor. See 29 U.S.C. §§ 1201-1242.

Finally, Title IV sets forth the rules governing termination of defined benefit plans, including mandatory procedures for terminating covered plans and distributing their assets, as well as termination insurance to pay pension benefits under covered plans that terminate without sufficient assets to pay those benefits. See 29 U.S.C. §§ 1301-1461.

The plan termination procedures of Title IV are the exclusive means of terminating a defined benefit pension plan.

See 29 U.S.C. § 1341(a)(1). Under Title IV, it is the employer who determines whether to terminate a plan, controls the execution of all plan amendments necessary for termination, and, through its chosen plan administrator, sets the plan's termination date. See, e.g., Beck v. Pace Int'l Union, 551 U.S. 96, 101-02 (2007); 29 U.S.C. §§ 1341(a)(2), 1348(a)(1). Title IV also establishes the PBGC and charges it with enforcing and administering that Title's provisions. 29 U.S.C. § 1302.

### 2.   Standard Terminations

When an employer decides to terminate a defined benefit pension plan by way of a standard termination[2] it must first choose a termination date. See 29 U.S.C. § 1341(a)(2); 29 C.F.R. § 4041.23. A "plan's termination date is significant in both voluntary and involuntary [pension plan] termination proceedings." Pension Ben. Guar. Corp. v. Broadway Maint. Corp., 707 F.2d 647, 649 (2d Cir. 1983). It is the date on which all benefit accruals cease, and as of which all benefits owed to plan participants are determined. See 29 U.S.C. § 1341(b)(1)(D) (mandating that plan liabilities be determined as of the plan's termination date); Pension Ben. Guar. Corp. v. Republic Techs.

---

[2]   A "standard termination" under 29 U.S.C. § 1341(b) identifies a plan with sufficient assets to cover its liabilities, whereas a "distress termination" under 29 U.S.C. § 1341(c) identifies a plan which lacks sufficient assets to cover its liabilities.

Int'l, LLC, 386 F.3d 659, 662 (6th Cir. 2004) (citing Broadway

Maint. Corp., 707 F.2d at 649).

The plan administrator must notify all plan participants,

beneficiaries,[3] alternate payees, and employee organizations

representing plan participants of the plan's termination date

and provide them with an explanation of the benefits to which

they are entitled. See 29 U.S.C. §§ 1341(a)(2), (b)(1),

(b)(2)(B); 29 C.F.R. §§ 4041.23, 4041.24. Before distributing

the plan's assets, the administrator must also file the Standard

Termination Notice-PBGC Form 500 ("Form 500") to notify the PBGC

of the termination date and provide detailed information about

the plan's assets and benefit liabilities. See 29 U.S.C.

§ 1341(b)(2)(A), 29 C.F.R. § 4041.25.

Once the PBGC has received the Form 500, the Agency has 60

days to determine whether there is "reason to believe" that the

plan has insufficient assets to pay benefit liabilities. 29

U.S.C. § 1341(b)(2)(C). To reach its determination, the PBGC

relies, in part, upon the plan administrator's calculation of

the actuarial present value of the plan's benefit liabilities as

of the proposed termination date. 29 U.S.C. § 1341 (b)(2)(A).

---

[3]   This Opinion uses "participant" and "beneficiary"
interchangeably throughout to describe persons who have or
should have received payment from the single-employer defined
pension benefit plan that is the subject of this litigation.

### 3.   *Distribution of Benefits*

If the PBGC determines that there is no reason to believe that the plan has insufficient assets to pay benefit liabilities, the plan administrator must distribute the plan's assets pursuant to Title IV of ERISA. 29 U.S.C. § 1341(b)(2)&(3); 29 C.F.R. § 4041.28.

Administrators generally may distribute benefits to plan participants in the form of annuities or lump-sum payments "in accordance with the provisions of the plan and any applicable regulations." 29 U.S.C. § 1341(b)(3)(A)(ii). A participant's plan benefits "are determined under the plan's provisions in effect on the plan's termination date." 29 C.F.R. § 4041.8. Post-termination amendments are permissible only under narrow circumstances -- so long as the amendment does not decrease the value of a participant's benefits or is necessary to meet the qualification requirements imposed by I.R.C. § 401. Id.

### 4.   *Calculating Lump-Sum Payments*

In order to calculate the dollar value of lump-sum payments, the plan administrator must find the present value of each participant's accrued benefits. That is, the administrator must use assumptions about mortality and interest rates to calculate the value of a lump-sum payment that will, in an actuarial sense, equal the value of monthly pension payments each plan participant is entitled to receive. See I.R.C.

§ 401(a)(25); 29 C.F.R. §4041.28. The interest rate used to calculate the present value of accrued benefits is inversely related to the value of the lump sum (i.e., higher interest rates yield smaller lump-sum payments).

The power of compounding interest and the long-term nature of pension obligations mean that even a slight change in the interest rate can have a significant impact on the size of the lump-sum payments. Thus, mortality and interest rate assumptions must be specified in the plan and may not be left to the employer's discretion. I.R.C. § 401(a)(25). Plans are not bound to adopt any particular set of actuarial assumptions. Instead, the present value of lump sums calculated according to the plan's terms "shall not be less than the present value calculated by using" the mortality table and interest rate specified in I.R.C. § 417(e)(3).[4] In effect, I.R.C. § 417(e) puts a floor -- but not a ceiling -- on the value of lump-sum payments.

Congress first enacted § 417(e)(3)'s minimum present value requirement in 1984 and has amended its applicable interest rate and mortality assumptions three times since then. See Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426, § 203(b) (1984); Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat.

---

[4]   A parallel provision also appears in Title I of ERISA. 29 U.S.C. § 1055(g).

2085, § 1139(b) (1986); Retirement Protection Act of 1994, Pub. L. No. 103-465, 108 Stat. 4809, § 767(a) (1994); Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat 780, § 302(b) (2006).

From 1986 to 1994, PBGC regulations set the applicable interest rates, but in 1994, Congress amended the statute to explicitly prescribe the applicable assumptions. See Retirement Equity Act of 1984, Pub. L. No. 98-397, 98 Stat. 1426, § 203(b) (1984); Retirement Protection Act of 1994, Pub. L. No. 103-465, 108 Stat. 4809, § 767(a) (1994). Generally, the 1994 version of I.R.C. § 417(e) called for plan administrators to calculate minimum lump-sum payments using the interest rate on 30-year Treasury securities and the mortality assumptions contained in the 1994 Group Annuity Reserve Table ("1994 GAR Table"). Collectively, the 1994 actuarial assumptions are known as the "GATT Structure."

   5.   Pension Protection Act of 2006

Congress most recently updated the minimum present value assumptions in the Pension Protection Act of 2006 ("PPA"). Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat 780, § 302(b) (2006). The new actuarial assumptions ("PPA Assumptions," "PPA Structure," or "§ 417(e) assumptions") generally result in smaller minimum lump-sum payments than those under the previous GATT Structure. Pension Ben. Guar. Corp. v.

Kentucky Bancshares, Inc., No. 14-5573, 2015 WL 221621, at *1 (6th Cir. Jan. 15, 2015).

### 6.    Anti-Cutback Provisions and PPA § 1107

Parallel "anti-cutback" provisions in Title I of ERISA and the I.R.C. prohibit amendments that reduce plan participants' accrued benefits. See I.R.C. § 411(d)(6); ERISA § 204(g), 29 U.S.C. § 1054(g). Recognizing that some sections of the PPA might require plan amendments that would otherwise violate the anti-cutback provisions, Congress explicitly provided relief from ERISA § 204(g) and I.R.C. § 411(d)(6), and offered plan administrators a grace period to take advantage of that relief. PPA § 1107.

Under PPA § 1107, if a plan administrator amends a pension plan in order to comply with the PPA, "(1) [the] pension plan or contract [he or she administers] shall be treated as being operated in accordance with the terms of the plan during the [grace period] . . . and (2) . . . such pension plan shall not fail to meet the requirements of section 411(d)(6) of the [I.R.C.] and section 204(g) of [ERISA] by reason of such amendment." PPA § 1107.

PPA § 1107 only applies if plan administrators observe certain requirements. First, any amendment must be made "on or before the last day of the first plan year beginning on or after January 1, 2009." PPA § 1107 (b)(1). Second, the amendment must

apply retroactively to the grace period and the plan must have been operated "as if such . . . amendment were in effect" during the grace period. PPA § 1107 (b) (2).

Notably, PPA § 1107 does not provide relief from the plan termination procedures in Title IV of ERISA and its implementing regulations.

### B. Factual and Procedural Background[5]

On January 1, 1971, Royal Oak, a Delaware limited liability company, adopted a defined benefit pension plan ("the Plan") for its hourly and salaried employees.

On August 27, 2008, Royal Oak sent Plan participants notice of the Company's intent to terminate ("NOIT") the Plan. The NOIT established October 31, 2008 as the Plan's termination date.

Section 5.02 of the Plan gave the participants a choice between receiving the remainder of their benefits in a lump sum or an annuity. The vast majority of Plan participants chose to receive a lump-sum payment which, pursuant to the Plan's terms

---

[5]     Pursuant to Local Civil Rule 7(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The parties have filed Cross-Motions for Summary Judgment. The Court thus takes these facts from the parties' Statements of Material Facts Not in Dispute. Furthermore, since this case calls for review of an administrative agency's decision, the Court relies only on facts contained in the Administrative Record ("AR"). Unless otherwise noted, the Court states only uncontroverted facts.

in Section 5.02, would "be the Actuarial Equivalent of the Participant's Accrued Benefit."[6] On October 31, 2008, Plan Section 1.02 provided that lump-sum payments would be calculated twice using two different sets of actuarial assumptions: 1) the Plan's own chosen interest rate and mortality table; and 2) the minimum-lump-sum assumptions provided by the GATT Structure.[7] Section 1.02 specified that each participant would be paid in accordance with "whichever [set of assumptions] produce[d] the larger benefit[.]"

On December 5, 2008, just over a month after the Plan's termination date, Royal Oak amended Section 1.02's lump-sum calculation method (the "PPA Amendment"). Under the PPA Amendment, lump sums would no longer be calculated using the two methods described above. Instead, lump-sum payments would be computed using only the interest rates and mortality tables provided in the PPA and codified at I.R.C. § 417(e). The PPA

---

[6]    Royal Oak's submission to the PBGC stated that 328 of the Plan's 361 participants had elected to receive lump-sum payments. Def.'s Stmt. ¶ 10. However, the PBGC's auditor found that the Plan had only 351 participants, 320 of whom received lump-sum payments. Def.'s Stmt. ¶ 10 n.15. Nevertheless, these figures are not in dispute and do not affect the outcome of this case.

[7]    More precisely, the two sets of assumptions were: 1) a 7% interest rate and the 1984 UP Mortality Table; and 2) the interest rate on 30-year Treasury securities for the month of November preceding the Plan year in which the calculation is made and the 1994 Group Annuity Reserving Mortality Table (together, the "GATT Structure"), as prescribed by the Retirement Protection Act of 1994.

Amendment adopted by Royal Oak purports to apply retroactively with an effective date of January 1, 2008.

On December 31, 2008, Royal Oak used Form 500 to notify the PBGC of the October 31, 2008 termination date. On or about the same date, Royal Oak provided each Plan participant and beneficiary with a notice of benefits owed, as required by ERISA's Title IV.

On June 23, 2009, in response to a request from Royal Oak, the IRS issued a Determination Letter ("IRS Letter") regarding the Plan's qualification for preferential tax treatment. The IRS's "favorable determination" applied "to the proposed termination date of 10/31/08" and "to the amendments dated 12/05/08 [the PPA Amendment] & 01/31/08." Significantly, the IRS made it clear that it was deciding only that "[Royal Oak's] termination of [the Plan] [did] not adversely affect its qualification for federal tax purposes." By its own terms, the IRS Letter "[was] not a determination regarding the effect of other federal or local statutes."

According to the post-termination PPA Amendment's formula, Royal Oak distributed lump-sum payments totaling roughly $13 million. If Royal Oak had employed the methodology in Section 1.02 as written on the termination date, it would have paid "approximately $2.1 million in additional benefits to 314 participants." Royal Oak Mot. at 2.

12

On November 13, 2009, Royal Oak filed Form 501, which certified to the PBGC that all benefits payable under the Plan had been correctly calculated in accordance with ERISA's provisions and regulations and that all benefit liabilities under the Plan had been satisfied.

In a letter dated April 27, 2010, PBCG notified Royal Oak that it would perform an audit of the Plan's termination. See 29 U.S.C. § 1303(a) (requiring the PBGC to audit a statistically significant number of terminations to determine if all participants received the benefits to which they were entitled).

On March 16, 2012, the PBGC issued its initial determination. The Agency found that the post-termination PPA Amendment violated one of Title IV's implementing regulations, 29 C.F.R. § 4041.8, because it decreased the value of benefits provided to Plan participants and beneficiaries receiving lump-sum payments. Section 4041.8 of the implementing regulations does permit post-termination benefit-decreasing amendments that are necessary to meet specific tax code requirements. I.R.C. § 401; 29 C.F.R. § 4041.8. However, the PBGC also found that the decrease imposed by the PPA Amendment was not necessary for tax code compliance. Accordingly, the PBGC ordered Royal Oak to recalculate the lump-sum payments and make additional distributions to Plan participants and beneficiaries as follows:

13

Recalculate the participants' lump sum value using the (1) plan rate [7.00%] and the UP-84 Mortality Table; (2) 30-year Treasury rate in effect for November 2008 [4.00%] and the 94 GAR Mortality Table; and (3) November 2008 segment rates in effect for the 2009 Plan Year . . . and the 2009 PPA Mortality Table. Participants are entitled to the highest amount. . . . Add interest to the additional benefits due using a reasonable interest rate. . . . [Pay] the additional benefits to affected participants. AR-0724.[8]

On April 30, 2012, Royal Oak requested reconsideration of the PBGC's initial determination. First, Royal Oak argued that, by operation of § 1107 of the Pension Protection Act of 2006, the PPA Amendment was not a post-termination amendment at all. Instead, the Amendment was retroactively effective as of January 1, 2008, and therefore, in effect on the termination date, October 31, 2008. Second, Royal Oak argued that even if the PPA Amendment was a post-termination amendment, it complied with 29 C.F.R. § 4041.8 because it did not decrease benefits and was necessary to meet requirements under I.R.C. § 401(a).

On July 7, 2013, the PBGC issued a letter upholding its initial determination. The PBGC reiterated its Order that Royal Oak recalculate the lump-sum payments and make additional distributions.

---

[8]    The first two methods of calculation are from Plan Section 1.02 as it appeared on October 31, 2008. AR-0133-0134. The third method employs the assumptions adopted by the PPA Amendment, which are also codified at I.R.C. § 417(e). Regardless of whether the PPA Amendment was in effect on October 31, 2008, the § 417(e) assumptions provide a statutory floor on the value of lump-sum payments. I.R.C. §§ 401(a), 417(e).

On July 9, 2013, Royal Oak filed its Complaint, which asks the Court to declare the PBGC's Findings and Decision "contrary to law, arbitrary, capricious, and an abuse of discretion." [Dkt. No. 1]. On September 16, 2013, the PBGC filed its Answer as well as a Counterclaim to enforce its Final Determination. [Dkt. No. 11].

## II.   STANDARD OF REVIEW

Summary judgment is the "appropriate mechanism" for disposing of actions for judicial review of final determinations by the PBGC. Davis v. Pension Ben. Guar. Corp., 864 F. Supp. 2d 148, 156 (D.D.C. 2012) aff'd in part, 734 F.3d 1161 (D.C. Cir. 2013) (quoting United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO-CLC v. Pension Ben. Guar. Corp., 839 F. Supp. 2d 232, 246 (D.D.C. 2012)). Summary judgment may be granted only if the moving party has shown that there is no genuine dispute of material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Waterhouse v. Dist. of Columbia, 298 F.3d 989, 991 (D.C. Cir. 2002).

When, as in the case at bar, the Court must decide a matter on the basis of an administrative record, the record compiled by the agency provides the complete set of facts before the Court. Deppenbrook v. Pension Ben. Guar. Corp., 950 F. Supp. 2d 68, 74

(D.D.C. 2013). The Court's task is to determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's decision will stand unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

With respect to questions of statutory interpretation, courts must first consider "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). If "the intent of Congress is clear" from the statute's language, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id.

However, where a statute is ambiguous, courts apply Chevron's second step by deferring to an "agency's construction of [a] statute which it administers." Id.; Nat'l Cable &

Telecommunications Ass'n v. Brand X Internet Servs., 545 U.S. 967, 989 (2005) ("[W]here a statute's plain terms admit of two or more reasonable ordinary usages, the [agency's] choice of one of them is entitled to deference."). Deference is due "not only because Congress has delegated law-making authority to the agency, but also because that agency has the expertise to produce a reasoned decision." Vill. of Barrington, Ill. v. Surface Transp. Bd., 636 F.3d 650, 660 (D.C. Cir. 2011).

Finally, an agency's interpretation of its own regulations is controlling unless plainly erroneous or inconsistent with the regulation. See Auer v. Robbins, 519 U.S. 452, 461 (1997); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

## III. ANALYSIS

29 U.S.C. § 1341 provides the "[e]xclusive means" for terminating single-employer pension plans and requires plan administrators to distribute assets "in accordance with the provisions of the plan and any applicable regulations." 29 U.S.C. § 1341(a)(1) & (b)(3)(A). Resolution of this matter rests primarily on the PBGC's regulation codified at 29 C.F.R. § 4041.8, which provides that a "participant's or beneficiary's plan benefits are determined under the plan's provisions in effect on the plan's termination date." 29 C.F.R. § 4041.8(a).

Royal Oak argues that, despite being adopted more than a month after the Plan's termination, the PPA Amendment accords

17

with § 4041.8.   First, Royal Oak contends that because it intended the Amendment to operate retroactively, the PPA Amendment was "in effect" on October 31, 2008. Second, Royal Oak insists that even if the PPA Amendment was not in effect on the termination date, it is permissible under § 4041.8's exceptions for amendments that do not decrease benefits or are necessary to meet certain tax code requirements. Royal Oak's arguments are without merit.

**A.   The PPA Amendment Was Not "in Effect" on the Plan's Termination Date.**

      *1.   The PBGC's interpretation of "in effect" is entitled to deference.*

Under 29 C.F.R. § 4041.8(a), "benefits are determined under the plan's provisions in effect on the plan's termination date." It is undisputed that Royal Oak did not amend the Plan until December 5, 2008, over a month after the Plan's termination on October 31, 2008. Royal Oak, argues, however, that because it intended for the PPA Amendment to operate retroactively, the Amendment was "in effect" on October 31, 2008.

In its Final Determination, the PBGC stated that the PPA Amendment was not "in effect" on the termination date because "[a]s of the date of Plan termination, [Royal Oak] had not yet adopted the PPA Amendment[.]" AR-0875. Thus, for the purposes of § 4041.8, the PBGC interprets "in effect" to require formal adoption.

Royal Oak complains about the PBGC's failure to explicitly define "in effect" in the text of § 4041.8. However, the PBGC's straightforward interpretation is a natural and reasonable reading of the regulation which reads as follows:

> A participant's or beneficiary's plan benefits are determined under the plan's provisions in effect on the plan's termination date. Notwithstanding the preceding sentence, an amendment that is adopted after the plan's termination date is taken into account [if certain exceptions apply.]" 29 C.F.R. § 4041.8(a).

Read together, the clear implication of these two sentences is that "an amendment that is adopted after the plan's termination date" is not "in effect on the plan's termination date [unless certain exceptions apply.]" Id.

Royal Oak cites Davis v. Pension Ben. Guar. Corp., 734 F.3d 1161, 1166, 1168 (D.C. Cir. 2013) cert. denied, 134 S.Ct. 2878 (2014) to support its argument that an amendment may be "in effect" before it has been adopted. However, the regulatory and statutory provisions discussed in Davis dealt with the priority of payments when a plan did not have sufficient assets to satisfy its pension liabilities, and therefore are not relevant in this case. Davis, 734 F.3d at 1168 (construing the meaning of "in effect" as used in 29 U.S.C. § 1344(a)(3)(A) and 29 C.F.R. § 4044.13).[9]

---

[9] Moreover, the definition of "in effect" at issue in Davis actually accords with the PBGC's reading in this case. In Davis, our Court of Appeals ultimately upheld the PBGC's view that an

Because the PBGC's interpretation of "in effect" is neither plainly erroneous nor contrary to the Regulation, it is entitled to deference. Auer, 519 U.S. at 461.

> 2. *Section 1107 of the Pension Protection Act of 2006 does not provide relief from 29 C.F.R. § 4041.8.*

Separate and apart from Title IV's plan termination provisions, ERISA's Title I includes "anti-cutback" provisions, which prohibit plan amendments that reduce accrued benefits even if the reductions occur before plan termination. See ERISA 204(g), 29 U.S.C. § 1054(g); I.R.C. § 411(d)(6) (parallel provision in I.R.C.). Recognizing that the Pension Protection Act of 2006 ("PPA") would require plan amendments that might reduce accrued benefits, Congress provided relief from the anti-cutback provisions. See PPA § 1107 ("such pension plan shall not fail to meet the requirements of section 411(d)(6) of the [I.R.C.] and section 204(g) of [ERISA] by reason of such amendment.").

Royal Oak contends that because it observed the requirements of § 1107, that section operated to make the PPA Amendment retroactively effective as of January 1, 2008. Thus, according to Royal Oak, the PPA Amendment was "in effect" on the

---

amendment is not "in effect" until the "later of the date on which [it] is adopted or the date it becomes effective." Davis, 734 F.3d at 1168.

termination date for purposes of Title IV and its implementing regulation 29 C.F.R. § 4041.8.

Contrary to Royal Oak's position, however, PPA § 1107 does not give amendments retroactive effect. Instead, retroactivity is a "condition" that amendments must fulfill in order to qualify for the relief section 1107 provides. PPA § 1107(b)(2) ("CONDITIONS- this section shall not apply to any amendment unless . . . such plan or contract amendment applies retroactively for such period.").

Moreover, retroactive amendments are unquestionably bound by § 4041.8's prohibition on post-termination benefit-decreasing amendments. After a plan is terminated, § 4041.8 operates to limit the set of permissible retroactive amendments to those that do not decrease benefits or are necessary for tax code compliance. Nothing in PPA § 1107 affects this crucial portion of Title IV's implementing regulations.

It is perfectly clear that while "PPA § 1107 amended the I.R.C., [it] says nothing about Title IV's prohibition against benefit reducing, post-termination amendments." Pension Ben. Guar. Corp. v. Kentucky Bancshares, Inc., 7 F. Supp. 3d 689, 700 (E.D. Ky. 2014) aff'd, No. 14-5573, 2015 WL 221621 (6th Cir. Jan. 15, 2015). "[C]ompliance with PPA § 1107 [does] not obviate [the] obligation to also comply with ERISA's standard termination requirements. The two sets of requirements are not

21

contradictory[.]" Kentucky Bancshares, 2015 WL 221621, at *4 (emphasis in original). For these reasons, this Court agrees with the Chief Judge of the United States District Court for the Eastern District of Kentucky that the "PBGC was not arbitrary or capricious in determining that PPA § 1107 did not authorize the post-termination reduction in benefits." Kentucky Bancshares, 7 F. Supp. 3d at 700.

Royal Oak claims the PBGC's reading of PPA § 1107 somehow conflicts with the IRS's Determination Letter. However, the IRS determined only that Royal Oak's amendments to and termination of the Plan "[did] not adversely affect its qualification for federal tax purposes." AR-0745. The IRS Letter distinctly states that it "is not a determination regarding the effect of other federal or local statues." Id. In sum, the Letter does not suggest in any way that § 1107 provides relief from 29 C.F.R. § 4041.8 or any other part of Title IV's statutory and regulatory provisions.

Finally, Royal Oak raises several practical concerns that it believes cut against the PBGC's interpretation of PPA § 1107. The Company argues that unless § 1107 is read to permit benefit-decreasing post-termination amendments, some plans may be left with insufficient funds to meet their liabilities. However, minimum plan funding rules already rely on the actual terms of the plan in effect and generally require plans to have

22

sufficient assets to pay benefit liabilities. <u>See</u> 26 C.F.R. §§ 1.430(d)-1(f)(4)(iii)(B) and (D).

Royal Oak also worries that unless § 1107 is read to negate § 4041.8's prohibition on post-termination benefit cuts, plan administrators could be forced to violate their fiduciary duties by treating similarly situated participants differently. The Company offers this example:

> [I]f a Royal Oak employee terminated employment in June 2008 and was eligible for a lump-sum distribution, his benefit would be calculated using the PPA Assumptions because plans were required to be in good faith compliance with the PPA beginning in January 1, 2008. <u>See</u> PPA § 1107(a)(1),(b)(2). But a participant eligible for the same lump-sum benefit distribution when the Plan terminated on October 31, 2008 would receive a benefit calculated using pre-PPA assumptions. Royal Oak Opp'n at 13.

Royal Oak's concern is unfounded. In its hypothetical, the Company could have: 1) simply adopted the PPA amendment prior to the plan termination date (all plan participants would then have been paid under the PPA Assumptions); or 2) made additional payments after termination to ensure that all participants received lump sums of the value required by the Plan's terms on the termination date. By waiting until after the termination date, Royal Oak was bound to comply with 29 C.F.R. § 4041.8's prohibition on post-termination benefit decreases.

Interestingly, Royal Oak never explains why it delayed its adoption of the PPA Amendment.

23

For all these reasons, the PBGC's determination that the PPA Amendment was not in effect on the Plan's termination date was not arbitrary, capricious, or otherwise contrary to the law.

**B.   The PPA Amendment Is Not a Permissible Post-Termination Amendment under Title IV of ERISA and 29 C.F.R. § 4041.8.**

Royal Oak argues that the PPA Amendment escapes § 4041.8's prohibition on post-termination benefit-decreasing amendments because (1) the amendment did not decrease the value of participants' benefits and (2) even if it did, the decrease was necessary to comply with tax code provisions. Neither argument is convincing.

> 1.   *The PPA Amendment "decrease[s] the value of the participant[s'] or beneficiar[ies'] plan benefits under the plan's provisions in effect on the termination date." 29 C.F.R. § 4041.8(a)(1).*

It is undisputed that adoption of the PPA Amendment resulted in Plan participants receiving roughly $2.1 million less in distributions than they would have received in its absence. Royal Oak contends, however, that Plan participants experienced no decrease at all in the value of their benefits.

The PBGC concluded that because Plan participants received smaller lump-sum payments under the PPA Amendment than they would have under the Plan as written on the termination date, the Amendment "decreased the value of the participant[s'] . . . plan benefits" within the meaning of 29 C.F.R. § 4041.8. AR-0875

("There is no doubt that the value of the lump sums calculated by [Royal Oak] using the PPA interest rate and mortality table is less than the value of the lump sums calculated using the formula provided under the Plan (i.e., 30-year Treasury rate and 94 GAR Mortality Table)."). Thus, the PBGC reads the word "value" to mean the dollar amount of payments actually received by Plan participants. Id. The PBGC's interpretation of § 4041.8(a)(1) is neither plainly erroneous nor inconsistent with the Regulation, and is, consequently, entitled to deference. Auer v. Robbins, 519 U.S. 452, 461 (1997).

Royal Oak attempts to draw the focus away from § 4041.8's language by contending that when Congress enacted the present value assumptions codified at I.R.C. § 417(e), it expressed its "legislative judgment" that lump sums calculated according to § 417(e) are necessarily equivalent to the value of accrued plan benefits. The company argues "[i]n Code section 417(e) Congress has prescribed how actuarial equivalence must be calculated for lump-sum distributions." Royal Oak Mot. at 16 (emphasis added). "Thus," Royal Oak contends, "rather than decreasing plan benefits, the PPA Amendment's substitution of the PPA [Assumptions codified at § 417(e)] for the GATT Structure merely updates the Plan's statutorily required methodology for calculating the present value of a participant's benefit under the Plan." Royal Oak Mot. at 16.

Royal Oak's characterization of the assumptions codified in § 417(e) is simply wrong. I.R.C. § 417(e) provides only the minimum value of lump-sum payments. Despite Royal Oak's repeated claims to the contrary, there is no evidence that Congress made a "legislative judgment" that the value of benefits calculated using the 417(e) assumptions is equivalent to the value calculated using other methods. Just the opposite is true -- 417(e)(3)(A) contemplates that plans will choose among different methods to calculate larger or smaller present values of plan benefits. That is why § 417(e) establishes a statutory minimum. I.R.C. § 417(e)(3)(A) ("[T]he present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate." (emphasis added)).

Royal Oak further argues that "[t]he appropriate inquiry is not whether the PPA Amendment reduced the amount of benefits, but whether it reduced the value of benefits." Royal Oak Reply at 11 (emphasis in original). This attempt to draw a distinction between the "amount" of benefits (which, according to Royal Oak, may decrease) and the "value" of benefits (which, under § 4041.8, may not decrease), Id., is unconvincing. Royal Oak's interpretation has no basis in the text of the Regulation itself. Subsection (a) of § 4041.8 discusses only "benefits" and the "value of" benefits. The word "amount" appears only in a

26

subsection unrelated to the issues in this case. 29 C.F.R. § 4041.8(b) (concerning plan's "residual assets" following termination).

Moreover, Royal Oak's interpretation of the words "decrease . . . the value of plan benefits" is unconvincing on its face. 29 C.F.R. § 4041.8. Despite the fact that Plan participants received approximately $2.1 million less in today's dollars than they would have under the terms of the Plan on its termination date, Royal Oak contends that Plan participants received the same "value." Confronted with a nearly identical factual situation (an employer's post-termination adoption of the § 417(e) assumptions in reaction to the Pension Protection Act of 2006), the Court of Appeals for the Sixth Circuit recently noted that "the post-termination amendment undeniably resulted in a decrease in the value of benefits to which participants and beneficiaries were otherwise entitled under the provisions in effect on the termination date." Kentucky Bancshares, Inc., 2015 WL 221621, at *2.

Finally, Royal Oak argues that because § 1107 of the Pension Protection Act of 2006 provided relief from Title I of ERISA's anti-cutback provisions, the PPA Amendment did not decrease the value of Plan benefits. However, as already discussed above, § 1107's grant of relief from specific provisions of Title I has no effect on Royal Oak's obligation to

27

abide by § 4041.8, which implements Title IV. Moreover, the anti-cutback relief provided under § 1107, see discussion at 20 supra, was necessary precisely because a change in actuarial assumptions was likely to lead to smaller lump-sum payments. Contrary to Royal Oak's view, § 1107's anti-cutback relief implies that Congress viewed new actuarial assumptions as potentially benefit-decreasing.

As the PBGC explained, "[on] its date of termination, the Plan did not simply promise payment of actuarially equivalent benefits, but actuarially equivalent benefits valued using the greater of the Plan's assumptions or GATT assumptions." PBGC Reply at 7 n.12. By amending its Plan to pay participants less after the termination date, Royal Oak decreased the value of Plan benefits and violated § 4041.8.

> 2. The "decrease" in the value of plan benefits caused by the PPA Amendment was not necessary "to meet a qualification requirement under section 401 of the [Internal Revenue] Code[.]" 29 C.F.R. § 4041.8(c)(1).

The parties agree that Royal Oak had an obligation to ensure that Plan participants received lump-sum payments no less than those calculated using the assumptions of the PPA Structure, codified at I.R.C. § 417(e). Royal Oak contends that the PPA Amendment was the only amendment that would ensure consistent, constant compliance with the PPA's changes to § 417(e), and therefore was the only amendment that Royal Oak

could have adopted to ensure tax qualification. Royal Oak's position is not correct.

The PBGC concedes that Royal Oak could have complied with § 417(e)'s minimum-lump-sum obligations by enacting the PPA Amendment prior to the termination date. If Royal Oak had simply amended the Plan before October 31, 2008 (a date Royal Oak itself chose), no barrier would have been posed by 29 C.F.R. § 4041.8, which limits only post-termination amendments.

However, by waiting until after the Plan's termination date, Royal Oak took on the burden of complying with both I.R.C. § 417(e) and 29 C.F.R. § 4041.8. After October 31, 2008, Royal Oak could decrease the value of lump-sum payments only if "necessary" to maintain tax compliance. 29 C.F.R. § 4041.8(c)(1).

Despite its assertions to the contrary, Royal Oak could have easily complied with the tax code without decreasing benefits to its Plan participants.

The PBGS's Final Determination explains that:

[Royal Oak] could have amended the Plan to pay the greater of the PPA interest rates and the 30-year Treasury rates [i.e., the rates outlined in the Plan on its termination date]. As a result, the PPA Amendment eliminating the use of 30-year Treasury rates and the GAR 94 mortality table for valuing lump sums was not necessary for Plan qualification, and the exception under 29 C.F.R. § 4041.8(c)(1) does not apply. AR-0875-0876.[10]

---

[10]   IRS guidance also suggests that plan administrators may comply with the I.R.C. and ERISA by calculating lump sums under

Royal Oak never states plainly why this "greater-of-the-two" formula, endorsed by both the PBGC and IRS, would not have met the requirements of I.R.C. § 417(e) without decreasing benefits. The Company does argue that "[u]sing any assumptions other than those dictated under Code § 417(e) [that is, the PPA interest rates] would run the risk that, given the fluctuating nature of interest rates, those assumptions could at some point produce a lower benefit amount than that produced by the assumptions in Code § 417(e)." Royal Oak Opp'n at 17. However, the PBGC's suggested alternative addresses precisely this problem. If Royal Oak had amended its Plan to pay the greater of the lump sums produced under § 417(e) and under the Plan's terms as of the terminations date, it would have complied with both 29 C.F.R. § 4041.8 and I.R.C. § 417(e).

Moreover, the PBGC has not ordered that Royal Oak adopt the "greater-of-the-two" formula. The Agency merely demonstrates that the benefit decrease was unnecessary because Royal Oak "could have amended the Plan to pay the greater of the PPA interest rates and the 30-year Treasury rates." AR-0875 (emphasis added).

_____

two methods and making payments pursuant to whichever method is more favorable to plan participants. 26 C.F.R. § 1.417(e)-1(d)(5); 2008-12 I.R.B. 638-42, IRS Notice 2008-30.

Accordingly, the PPA Amendment adopted by Royal Oak was not a valid post-termination amendment, and therefore it must make additional payments to ensure that Plan participants receive the benefits to which they were entitled "under the plan's provisions in effect on the plan's termination date." 29 C.F.R. § 4041.8(a).

## IV.   CONCLUSION

For the foregoing reasons, Royal Oak's Motion for Summary Judgment is **denied,** and PBGC's Motion for Summary Judgment is **granted.**

An Order shall accompany this Memorandum Opinion.

January 28, 2015

Gladys Kessler
United States District Judge

**Copies to**: attorneys on record via ECF